IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ANDREA E. FOSHEE                                                                    PLAINTIFF

       v.                       Civil No. 3:12-CV-3126-JRM

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                                      DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Andrea E. Foshee, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability, disability insurance benefits ("DIB"), supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff applied for Title II (child's insurance benefits) and Title XVI (supplemental security income) October 6, 2009. (Tr. 130, 137.) Plaintiff alleged an onset date of June 1, 2007 due to ADHD and seizures. (Tr. 153.) Plaintiff's applications were denied initially and on reconsideration. Plaintiff requested an administrative hearing, which was held on December 17, 2010. (Tr. 28.) Plaintiff was present to testify and was represented by counsel. The ALJ also heard testimony from Vocational Expert ("VE") Sarah Moore. Three witnesses were present and testified for the Plaintiff: Ramona Foshee (Plaintiff's mother), Ingred Pompenski (Plaintiff's grandmother), and Rusty MacMahan (Plaintiff's fiancee'). (Tr. 28, 31.)

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

At the time of the administrative hearing, Plaintiff was 22 years old, and possessed a high school diploma (special education track). (Tr. 32, 51.) Plaintiff attended a rehabilitation school in Hot Springs during 2008 and part of 2009. (Tr. 32.) The Plaintiff had no past relevant work experience ("PRW"). (Tr. 34.)

On September 21, 2011, the ALJ concluded that the Plaintiff has the following severe impairments: seizure disorder, obesity, chronic low back pain, adjustment disorder with depressed mood, learning disorder not otherwise specified (NOS), attention-deficit hyperactivity disorder by history, and borderline intellectual functioning. (Tr. 12.) The ALJ found that Plaintiff maintained the residual functional capacity to perform light work, but could only occasionally climb, balance, stoop, kneel, crouch and crawl. The Plaintiff "must avoid concentrated exposure to extreme heat and cold and avoid even moderate exposure to hazards including work near moving machinery or at unprotected heights. She cannot drive as a part of work. Non-exertionally, the claimant is able to perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote with few variables and use of little judgment, and the supervision required is simple, direct and concrete." (Tr. 15-16.) With the assistance of the VE, the ALJ determined that the Plaintiff could perform such representative occupations as housekeeper, inspector, and fast food worker. (Tr. 21-22.)

Plaintiff requested a review by the Appeals Council on October 4, 2011. (Tr. 129.) The Appeals Council denied the appeal on September 11, 2012. (Tr. 1.)

**II.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record

to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider

the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III. Discussion:**

Plaintiff raises three[2] issues on appeal: 1) the ALJ's RFC of light work capability is unsupported by substantial evidence because it fails to account for the vocational impact of Plaintiffs obesity and the findings of Dr. Hudson relating to her seizures; 2) the ALJ erred in evaluating Plaintiff's credibility; and 3) the ALJ erred in failing to find that the Plaintiff's seizures met Listing §11.03 for epilepsy. (Pl.'s Br. 14, 19, 21.)

**1. ALJ's RFC Determination**

**A. Obesity**

Plaintiff argues that the ALJ evaluated the effect of Plaintiff's obesity on her RFC without input from physicians on this point. (Pl.'s Br. 15.) Specifically, she argues that the combined effects of obesity with her other impairments pursuant to SSR 02-1p were not considered. (Pl.'s Br. 15.)

Obesity was removed from the Appendix 1 Listing of Impairments in 1999. SSR 02-1p. However, the Agency still considers obesity to be a medically determinable impairment, and its effects should be considered when assessing a claimant's RFC. SSR 02-1p. In evaluating RFC, the Agency has recognized that obesity can create limitations on exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. Limitations on postural function can include sitting, standing, walking, lifting, carrying, pushing, and pulling. "The ability to tolerate extreme heat, humidity, or hazards may also be affected." SSR 02-1p.

However, as is the case with any medical impairment, a diagnosis of obesity does not automatically require a finding of disability. *See Trenary v. Bowen*, 898 F.2d 1361, 1365 (8th Cir.1990).

---

[2]Plaintiff included four point headings of alleged error in her brief. However, as the fourth point heading and section merely recite the substantial evidence standard and include a conclusory statement that the ALJ's decision does not meet it, this fourth "argument" will not be addressed.

Rather, the ALJ must make a disability determination regarding the degree of disability based on the functional limitations, if any, that are caused by the impairment in question. *Id.* An ALJ may properly discount the effects of obesity when a Plaintiff did not allege functional limitations due to obesity in the benefits application or at the hearing. *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003). An ALJ may also discount the effects of obesity when no physician in the medical record ever placed physical limitations on that Plaintiff's ability to perform work-related functions due to obesity. *Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.")

The medical records consistently diagnose Plaintiff as obese or morbidly obese. (*See e.g.* Tr. 297, 339, 342, 343, 345, 349, 361, 363, 391, 532.) She has been prescribed medications and exercise for weight loss. (Tr. 297, 346, 546.) However no physician has indicated the her ability to work suffered any limitation as a result of her obesity. (Tr. 366-69, 574.) Treating neurologist Dr. Paul Tucker stated that he would "prefer she work" and that "she is capable of employment and driving a car" once her seizures were under control. (Tr. 378, 555.) Neither the Plaintiff nor her three witnesses testified that her obesity limited her functional abilities.

Despite this lack of support for obesity-related functional limitations in the record, Plaintiff's RFC nonetheless takes her obesity into account. Her physical RFC assessment was completed by non-examining consulting physician Dr. Takach, M.D, and listed seizure disorder as the primary diagnosis with obesity as the secondary diagnosis. (Tr. 399, 406.) The physical RFC included exertional, postural, and environmental limitations. (Tr. 400-02.) The limitations included mirrored many of those suggested as possible limitations for an individual suffering from obesity in SSR 02-1p. The ALJ expressly noted her obesity in assessing her overall RFC and included those limitations in the overall RFC:

5

> "The undersigned has considered the fact that obesity is a risk factor that increases a claimant's chances of developing impairments in most body systems and commonly leads to, and often complicates, chronic disease of the cardiovascular, respiratory, and musculoskeletal body systems. (See SSR 02-1p.) Therefore, based on the claimant's migraine headaches, back pain and obesity, the undersigned finds that the claimant is limited to light exertional level work with only occasional climbing, balancing, stooping, kneeling, crouching and crawling, and that she must avoid concentrated exposure to temperature extremes."

(Tr. 18.)

There is substantial evidence in the record that the ALJ properly evaluated the effect of Plaintiff's obesity on her overall RFC.

### B. Seizures and the Findings of Dr. Hudson

Plaintiff appears to argue that the ALJ should have given more weight to Dr. Hudson's observations about Plaintiff's seizures. This argument is without merit.

First, in his consultative mental examination of the Plaintiff, Dr. Hudson only noted the seizures as part of her medical history in his background and as part of the Axis III portion of the diagnosis. (Tr. 407-10.)

Second, in discussing Plaintiff's mental/cognitive abilities on basic work-like tasks, Dr. Hudson stated that "no employer would want to give CL much responsibility." (Tr. 409.) Plaintiff appears to argue that this statement is a medical confirmation that she could have a seizure at any moment. (Pl.'s Br. 17.) Even assuming that this was Dr. Hudson's intent, the ALJ properly did not address it in that context, as Dr. Hudson is a psychologist, not a medical doctor, and would be opining outside his area of expertise. *See Brown v. Astrue,* 611 F.3d 941 (8th Cir. 2010) (ALJ may "reject" a doctor's opinion when they do not have specialized training in treating and diagnosing the impairment in question); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (holding that Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist).

Third, the ALJ specifically made note of Dr. Hudson's comment, and indeed the rest of Dr. Hudson's diagnosis, in evaluating Plaintiff's mental impairments. (Tr. 14.)

**2. ALJ's Credibility Determination**

Plaintiff argues that the ALJ did not make a credibility finding either per *Polaski* or under a more relaxed standard. (Pl.'s Br. 19.) Instead, Plaintiff argues that the ALJ "merely recited" the medical records. (Pl.'s Br. 20.)

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir.2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2002)). The ALJ must consider several factors when evaluating a claimant's subjective complaints of pain, including claimant's prior work record, observations by third parties, and observations of treating and examining physicians relating to 1) the claimant's daily activities; 2) the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Casey*, 503 F.3d 687, 695 (8th Cir.2007) (citing *Polaski v. Heckler*, 729 F.2d 1320, 1322 (8th Cir.1984). In discrediting a claimant's subjective complaints, an ALJ is required to consider all available evidence on the record as a whole and is required to make an express credibility determination. *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000). However, the ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004). Nor will the Court "set aside an administrative finding based on an 'arguable deficiency in opinion-writing technique' when it is unlikely it affected the outcome." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (quoting *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir.1987).

In this case, the ALJ summarized the medical records chronologically and with great attention to detail over five pages of the opinion. Implicitly listed in this summary are a number of inconsistencies in the record that can be used to discredit the Plaintiff's subjective allegations. The ALJ did not,

7

however, expressly point out the areas of inconsistency, requiring the reader to connect the implied inconsistency dots embedded in that summary instead. This was a clear error of opinion-writing technique, and not one encouraged by this Court. However, given the number and seriousness of the inconsistencies that were implicitly included in that chronological summary, it also appears clear that this was harmless error in an otherwise very thorough review by the ALJ. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the Plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred.")

For example, the ALJ noted that the Plaintiff testified that she has anxiety and panic attacks in crowds. (Tr. 16.) But she reported that she lived at the rehabilitation school in Hot Springs, attended classes, ate meals there, and got along with fellow students. (Tr. 16.) He also noted that she "does not avoid crowds, goes to church, and goes out to eat." (Tr. 14.) The ALJ later noted that Dr. Hudson found she did not demonstrate significant social interaction limitations such as avoiding crowds. (Tr. 19.)

Regarding her medications, the Plaintiff testified that she was taking her prescribed anti-convulsant medication, Lamictal, as prescribed. (Tr. 16.) She admitted to not taking an earlier anti-convulsant medication, Topamax, as prescribed. (Tr. 17.) Although not noted in the ALJ's summary, the record indicates that Dr. Tucker stated she was not taking her Lamictal as prescribed. (Tr. 483.)

In discussing the results of her sleep study, the ALJ noted that while she reported taking thirty minutes to fall asleep, she only took six and a half minutes at the sleep center. Therefore there was no evidence of insomnia. (Tr. 13.)

Regarding her headaches, the ALJ noted that she reported developing migraine headaches "each time she had a seizure or even a 'little' seizure."(Tr. 18.) She also complained of frequent migraine headaches four times a week, apart from seizures. (Tr. 18.) In January 2009 she told Dr. Tucker that she had "two headaches per week for the past four years." (Tr. 18.) She reported she believed those to be caused by her Topamax. (Tr. 18.) After Dr. Tucker prescribed Lamictal, she did not continue to seek

8

treatment for headaches. (Tr. 18.) Yet, the ALJ noted that, at the hearing, the Plaintiff attributed her disability primarily to seizure disorders and migraines. (Tr. 16.)

In summary, the ALJ's review of the records indicates failure to follow prescribed treatment, failure to seek treatment, and testimony inconsistent with the objective medical record. Any one of these would be sufficient to discredit at least some of the Plaintiff's subjective allegations. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."); *Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir.1995) (holding "[g]iven his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability"); *Polaski v. Heckler*, 729 F.2d at 1322 ("The ALJ may discount subjective complaints when they are inconsistent with the evidence as a whole.").

Given the number and seriousness of the inconsistencies implicitly apparent in the ALJ's opinion, it is unlikely that a remand requiring the ALJ to explicitly label them as inconsistencies would produce a different result. Therefore, the deficiencies in the opinion are harmless error.

### 3. Listing §11.03 for Epilepsy

Plaintiff argues that the ALJ erred when he found her seizure disorder did not meet the listing requirements for §11.03 Epilepsy**.** (Pl.'s Br. 21.) Plaintiff further argues that if her seizure order did not meet the listing, that the ALJ should have found it to be the medical equivalent of epilepsy. (Pl.'s Br. 21-22.)

To meet Appendix 1 Listing §11.03 Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal) the Plaintiff must document in detail the typical seizure pattern, the seizures must occur "more frequently than once weekly in spite of at least 3 months of prescribed treatment," and include "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 CFR App. 1 §11.03. The criteria for epilepsy can be applied "only if the impairment persists despite the fact that the individual is following prescribed

antiepileptic treatment." 20 C.F.R. App. 1 §11.00(A). Adherence to therapy can be determined with objective clinical findings, including blood levels of the drugs. *Id*. When seizures are occurring at the frequency indicated in 11.02 or 11.03, then evaluation of the severity of the impairment "must include consideration of the serum drug levels." *Id*. If serum drug levels are therapeutically inadequate, consideration should be given as to whether this is caused by "individual idiosyncracy in absorption of metabolism of the drug." *Id.* If low, the information from the treating physician should include an explanation why the drug blood serum level is low. *Id.*

The Plaintiff bears the burden of proof to establish that her impairment meets or equals a listing requirement. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). For the plaintiff to meet this burden she "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010). "There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ found that the claimant's medical records "were not indicative of the specific clinical signs and diagnostic findings pertaining to a seizure disorder." (Tr. 13.) After noting some variation in testimony, the ALJ found that the testimony consensus was that Plaintiff was taking her anti-seizure drug Lamictal as prescribed but was still experiencing grand mal seizures two to three times per month and petit mal seizures two to three times a week. After either type of seizure, Plaintiff would suffer a migraine headache. (Tr. 16.)

The medical records indicate that the Plaintiff experienced her first grand mal seizure after gallbladder surgery in October 2007 while still in the hospital for postoperative care. (Tr. 17.) Her EEG was normal, and the seizure was thought to be drug-induced. (Tr. 388.) Her next seizure was January

10

5, 2009 while in the car with her mother. (Tr. 388.) A CT brain scan at St. Vincent's on January 12, 2009 was normal. (Tr. 268.) She has been examined by Dr. Brinson (D.O.), Dr. Kaufman, and Dr. Paul Tucker of St. Joseph's Mercy Health Center, with Dr. Tucker providing progress notes and a seizure report for the record. Dr. Kaufman and Dr. Tucker are in the Department of Neurology at St. Joseph's. (Tr. 442, 475, 485.) Plaintiff was examined by Dr. Kaufman on January 30, 2009. He noted that the blood work and brain CT imaging done at St. Vincent's were "unremarkable." (Tr. 388.) Dr. Kaufman noted that "[a]ssuming the major motor (i.e., grand mal) seizures outlined above are legitimate, the description of subsequent milder events is suspicious for psychogenic seizures. (Tr. 391.) He ordered a brain MRI, EEG, overnight sleep study, and blood work. (Tr. 391.) The February 2009 EEG was normal. (Tr. 434.) The February 2009 brain MRI was normal. (Tr. 398.) Her sleep study was normal. (Tr. 392.)

Plaintiff was initially prescribed the anti-convulsant drug Topamax, but it was changed to Lamictal in December 2009 by Dr. Tucker. (Tr. 407, 471.) Plaintiff admitted to being non-compliant with the Topamax. (Tr. 469, 470.) According to the record, the Topamax initially helped her headaches, (Tr. 353.), but then later gave her headaches. (Tr. 462, 469.)

A progress note dated November 5, 2009 from Dr. Tucker indicated "she has had only two seizures in the last two months. (Tr. 392.) Plaintiff had a witnessed seizure while at school on November 11, 2009 and returned to Dr. Tucker. (Tr. 481.) An EEG on December 15, 2009 was "mildly abnormal" with nonspecific changes that "could be related to a mild seizure tendency." (Tr. 481.)

An SSA seizure report performed by Dr. Tucker on February 2010 indicated a seizure frequency of one per month. (Tr. 483.) His notation for the date and results of the last serum drug level test stated: "I note none. (?) <u>Never on adequate prescription</u>." His notation for the last adjustment of medication was "1-20-2010. I wanted Lamictal [illegible]. She took only 100 1X per day." For number of seizures after the medicine adjustment, he noted: "several (?) on above dosage." (Tr. 483.)

11

A medical evaluation analysis on March 2010 by Dr. Brown included Dr. Tucker's seizure report and noted the error on the signature date, which stated February 2009 instead of 2010. He noted that the Plaintiff "[h]as never been on adequate Rx to do serum drug levels. EEG has been nrml waking and sleeping. (Tr. 487.)

The Listing requires the Plaintiff to have seizures "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment" and a blood serum drug level finding to verify that anti-epileptic treatment is being followed. The medical record provides no clear data on the number of seizures the Plaintiff has been suffering on average. The most frequent incidence noted by a physician was "two in the last two months" by Dr. Tucker. This frequency does not meet the Listing requirement of more than one per week. This is in direct contrast to the Plaintiff's testimony of a petit mal seizures every other day, (Tr. 37.), and grand mal seizures of "maybe three a month." (Tr. 38.) This frequency would meet the Listing requirement.

However, frequency is only one part of the Listing requirement. The criteria for epilepsy can be applied "only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment." Blood serum drug levels are required to verify that the Plaintiff is following prescribed drug treatment. In this case, the Plaintiff testified that she is following her prescribed treatment. (Tr. 37.) However, the medical records have several notations of non-compliance with her anti-convulsant prescriptions from her treating physicians. Further, Dr. Tucker noted there was no serum blood level test done because she did not take her medications as prescribed and therefore was "never on an adequate prescription."

Because the Plaintiff could not provide blood serum level test results to verify that she is taking her anti-convulsant drugs as required, and the medical record further indicates evidence of non-compliance with prescribed treatment, the ALJ properly found that she did not meet her burden of proof to show that her impairment met or equaled Appendix 1 Listing §11.03.

V.    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decisions, and thus the decision should be affirmed. The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 18th day of December 2013 .

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE